UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff<br><br>    v.<br><br>HECTOR ADONI-PENA,<br>    Defendant | File No. 1:09-CR-28 |

RULING ON MOTION TO SUPPRESS
(Paper 19)

I.  Introduction

Defendant Hector Adoni-Pena is charged with illegally reentering the United States after being deported in violation of 8 U.S.C. § 1326(a). Adoni-Pena moves to suppress statements and other evidence. He argues his Fourth and Fifth Amendment constitutional rights were violated so his statements and any evidence discovered by the police must be suppressed. (Paper 12.) The government opposes the motion. (Paper 13.) The Court held an evidentiary hearing on August 18, 2009 and heard testimony from Officer Young of the Colchester Police Department, Border Patrol Agent Peters, and the Defendant. Adoni-Pena and the government filed further briefing after the hearing. (Papers 19, 20.) For the reasons stated below, the Court grants in part and denies in part the Defendant's motion.

1

II. <u>Background</u>[1]

At approximately 5:45 p.m. on February 22, 2009 -- a cold and very snowy evening -- a Colchester resident reported two men who appeared to be Mexican had asked him what town they were in and explained they were trying to get to Canada by following railroad tracks.  Colchester Police Officer Young responded to the general location and, after driving by two men matching the description at least four times, engaged in a conversation with them, asking to see identification and inquiring about their general situation.  Before he became a police officer, Young served with the U.S. Border Patrol.  Defendant answered Officer Young's questions, stating they were from North Carolina, in the area looking for work, and headed to a Burlington shelter. Officer Young called his dispatcher with information obtained from the social security cards and dates of birth given to him by both men.  Young requested Border Patrol be contacted to determine if the men should be detained.

While waiting to hear back from his dispatcher, Officer Young asked the men if they would like to sit in his car to warm up and told them he would request his dispatcher contact shelters in Burlington on their behalf.  After a pat-down search of each man, they voluntarily got into the back of the car.  Officer Young then asked for picture identification.  Defendant provided

---

[1] The facts described in this section are undisputed or are found by the Court after the evidentiary hearing.

a permanent resident card with his picture that matched the name on the social security card.  Officer Young relayed the alien registration number to his dispatcher and requested the number be provided to Border Patrol.

Officer Young began to drive south toward Burlington.  On the way, he received instructions from Border Patrol to detain the men.  Border Patrol Agent James Peters had asked Officer Young to detain the men because the alien registration number on Defendant's identification card was not listed on any immigration database.  Instead of telling the Defendant of Agent Peters' request, Young told him that the dispatcher was attempting to ascertain if there was a space for the two men in the shelter, and asked if they would be willing to wait at the station.  They agreed to accompany Young to the Colchester Police Station.

Upon arrival at the station, Officer Young placed the men in a second floor interview room, leaving the door unlocked.  There were no bars on the windows and the men were not handcuffed. While at the police station, Peters spoke to Defendant who was on a phone in the hallway of the station.  Neither Officer Young nor Agent Peters advised Defendant of his <u>Miranda</u> rights.  During the conversation, Defendant initially claimed to be a lawful permanent resident, but when informed his story was unlikely and the alien registration number was unassigned, admitted he was in the United States illegally.  Officer Young also spoke with Agent

Peters who advised him that he would be taking the men into custody. At the conclusion of the phone conversation, Officer Young took the men to the holding cell where they were handcuffed for the first time.

Agent Peters drove to Colchester, took custody of the men, placing them under "administrative arrest" for being in the United States illegally, and transported them to the Swanton Border Patrol Station. Upon arrival at the Swanton station, Defendant was fingerprinted and the results revealed both criminal and immigration records, including a prior conviction for illegally reentering the country after deportation. After learning this information, Agent Peters advised Defendant of his <u>Miranda</u> rights for the first time. He provided the warning in Spanish at 9:57 p.m. (Government's Ex. 2.) Defendant waived his right to a lawyer and gave a sworn statement, signed at 10:35 p.m. (Government's Ex. 3.) Defendant admitted he entered the United States illegally and had been previously deported. <u>Id.</u>

Defendant moves to suppress his name and identity, immigration and criminal history, and statements relating to his legal status in the United States, as well as the use of his fingerprints and physical property seized from him. (Paper 12 at 1, 4.) He argues the identity information, fingerprints, property, statements, and histories were obtained in violation of his Fourth and Fifth Amendment rights.

4

III. Discussion

Contrary to the government's position, the Court follows the majority of circuits which have concluded the Supreme Court decision of INS v. Lopez-Mendoza, 468 U.S. 1032 (1984), addressed a jurisdictional -- not evidentiary -- challenge.  Thus any language in that opinion suggesting identity-related evidence is never suppressible is not controlling.  See United States v. Arias-Gonzalez, 556 F.3d 1181, 1186 (11th Cir. 2009); United States v. Oscar-Torres, 507 F.3d 224, 228 (4th Cir. 2007); United States v. Olivacea-Range, 458 F.3d 1104, 1111 (10th Cir. 2006); United States v. Garcia-Beltran, 389 F.3d 864, 866-67 (9th Cir. 2004); United States v. Guevara-Martinez, 262 F.3d 751, 754-55 (8th Cir 2001).

Though identity-related evidence may be suppressed, Adoni-Pena must show that his Fourth or Fifth Amendment rights were violated for the Court to suppress evidence, including incriminating statements.  See, e.g., Oscar-Torres, 507 F.3d at 230 (citing Wong Sun v. United States, 371 U.S. 471, 488 (1963)) (identity-related evidence is suppressible only if obtained by "exploitation" of the initial police illegality).

A.   Motion to Suppress Evidence

The Fourth Amendment prohibits unreasonable searches and seizures.  Reasonable suspicion "that criminal activity may be afoot" provides a sufficient basis under the Fourth Amendment for

5

a law enforcement officer to briefly detain a person.  <u>United States v. Bayless</u>, 201 F.3d 116, 132 (2d Cir. 2000) (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968)).  Reasonable suspicion should be based on specific and articulable facts objectively indicating unlawful conduct.  <u>Id.</u> at 132-33 (internal citations omitted).  The Court considers the totality of the circumstances and evaluates them "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training."  <u>Id.</u> at 133 (internal citations omitted).

Defendant does not contest that Officer Young reasonably suspected criminal activity -- specifically, that defendant may have been in the country illegally -- to initially justify a limited investigative stop, <u>i.e.</u>, a <u>Terry</u> stop.  (Paper 12 at 5.)  Consequently, the issue is whether his conduct exceeded the scope of a permissible investigative stop.  <u>United States v. Glover</u>, 957 F.2d 1004, 1009 (2d Cir. 1992).

To withstand challenge, an investigatory stop must be "'reasonably related in scope to the circumstances which justified the interference in the first place.'"  <u>United States v. Sharpe</u>, 470 U.S. 675, 682 (1985) (citing <u>Terry</u>, 392 U.S. at 20).  The scope of permitted intrusion varies based on the circumstances of each case, <u>Florida v. Royer</u>, 460 U.S. 491, 499-500 (1983), however, a critical factor is the length of the detention.  <u>Glover</u>, 957 F.2d at 1011.  To determine

reasonableness of the duration of a stop, a court must "'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" Id. (citing Sharpe, 470 U.S. at 686). The Court should not second guess a law enforcement officer's means of investigation so long as it was not unreasonable, Sharpe, 470 U.S. at 686-87, but the stop must not last longer than is necessary to effectuate its purpose. Royer, 460 U.S. at 500. These standards apply equally to the detention of personal effects. Id. If an initially valid investigative stop continues too long or becomes unreasonably intrusive, it becomes a de facto arrest requiring probable cause. Id.

Officer Young's first contact with Defendant was reasonable. When Defendant and his companion were near Officer Young and his car, he requested their identification. Florida v. Bostick, 501 U.S. 429, 434 (1991) (even without suspicion, an officer may ask questions and examine identification). When Officer Young -- a former Border Patrol agent -- examined the two social security cards, he suspected that one of the cards was fake. (Paper 19 at 3.) He requested his dispatcher check the names in the law enforcement databases and advise Border Patrol that the two men may be illegal aliens. These investigative actions were likely to quickly confirm or dispel Officer Young's suspicion that the

7

two were illegally in the country.  <u>Sharpe</u>, 470 U.S. at 686.  To this point, the scope and duration of the stop were reasonable.

Because Officer Young did not hear back from his dispatcher immediately and the evening was cold and snowy, he invited the two men into his car.  He requested a picture identification and Defendant provided a permanent resident identification card bearing the name Carlos Cisneros.  This information, including the alien registration number, was relayed to the dispatcher.  He initially offered the men a ride to a shelter in Burlington; however, upon hearing from the dispatcher that Border Patrol wanted them detained, he transported them to the Colchester Police Station, explaining his dispatcher was attempting to find a place in a shelter.  This statement was not true.  At the police station, the men were left in a second floor interview room without restraints and the windows had no bars.  Officer Young could not recall whether he returned the men's identification.

The standard to determine whether a seizure has occurred is whether a reasonable person in the circumstances would have believed that she was not free to leave.  <u>Id.</u> at 819.  While sitting in a second floor room in a police station, ostensibly awaiting a ride to a Burlington shelter, a reasonable person would not have felt free to leave.  At this point, considering the totality of the circumstances, the men were seized.  <u>United</u>

States v. Lee, 916 F.2d 814, 819 (2d Cir. 1990) (factors which indicate a seizure occurred include retention of identification and a request to accompany the officer to a police office). A seizure, like a stop, may be constitutional if based on reasonable suspicion that criminal activity is afoot. United States v. Sokolow, 490 U.S. 1, 7 (1989).

Reasonable suspicion that Defendant Adoni-Pena was an illegal alien remained and was bolstered by the directive from Border Patrol Agent Peters to retain the men because Defendant's alien registration number was unassigned. Because reasonable suspicion of criminal activity was present, the seizure is constitutional if the scope and duration of the seizure was reasonable.

The next significant event was the telephone conversation between Defendant and Agent Peters -- in English. Eventually, Defendant admitted his identification card was fake and that he was in the United States illegally. The investigative actions of checking Defendant's alien registration number and speaking to the Defendant were not unreasonably intrusive, and were calculated to quickly confirm or dispel the reasonable suspicion that Defendant was an illegal alien. The scope and duration of the seizure of Defendant at the police station were reasonable.

Following the call with Agent Peters, Defendant Adoni-Pena was placed in a holding cell, officially in custody, and not free

9

to leave.  When he was taken into custody, the seizure ripened into an arrest which must be supported by probable cause.  Probable cause exists when, considering the circumstances, there is "reasonably trustworthy information" for a person of reasonable caution to believe an offense has been committed by the person to be arrested.  McGuire v. City of New York, 142 Fed. App'x 1, 3 (2d Cir. 2005) (internal citation and quotation omitted).  In these circumstances, Officer Young had probable cause to arrest Defendant after learning from Agent Peters that Defendant's alien registration number was unassigned so the card was likely forged or counterfeit.

    B.    Motion to Suppress Statements

An individual must be advised of Fifth Amendment rights before custodial interrogation.  Miranda v. Arizona, 384 U.S. 436 (1966).  An individual has the right not to speak and to request an attorney while in custody and any interrogation must stop until an attorney is present.  Id. at 474.  The government bears the burden of establishing by a preponderance of the evidence law enforcement officers properly advised an accused of his Fifth Amendment rights and he made a knowing and voluntary waiver of them.  Id. at 444; Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Ramirez, 79 F.3d 298, 304 (2d Cir. 1996).  Here, the government argues Defendant was not in custody,

10

so no <u>Miranda</u> rights were necessary, and the statements are not suppressible.  (Paper 13 at 11.)

Custodial interrogation has two components:  the individual is in custody and is questioned with investigative intent.  <u>United States v. Rodriguez</u>, 356 F.3d 254, 258 (2d Cir. 2004) (citing <u>United States v. Morales</u>, 834 F.2d 35, 38 (2d Cir. 1987)).  An individual is "in custody" if questioning was "conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak."  <u>Id.</u> (quoting <u>Morales</u>, 834 F.2d at 38).  As in a Fourth Amendment analysis, to determine whether an individual is "in custody," the court must decide whether a reasonable person would have felt "at liberty to terminate the interrogation and leave."  <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995).  In the absence of a formal arrest, the court must consider whether law enforcement officials acted or spoke in a manner that conveyed the message that they would not permit the individual to leave.  <u>United States v. Ali</u>, 86 F.3d 275, 276 (2d Cir. 1996).

Defendant was in custody when he was placed in the interview room at the Colchester police station.  After speaking with Agent Peters, Officer Young escorted Defendant to the phone in the hallway to speak with Agent Peters.  Adoni-Pena was given no indication he could decline to talk to Agent Peters and leave the

11

police station.  See United States v. Valentine, No. 08-CR-6124L, 2009 WL 2952232 (W.D.N.Y. Sept. 16, 2009) (finding defendant was in custody when subjected to questioning without any indication from the officers that he could end the questioning and walk out).  Indeed, Agent Peters instructed Officer Young to continue to detain the men until his arrival.  In these circumstances, a reasonable person would not have felt free to end the conversation and leave the station.  Defendant was "in custody" when Agent Peters interrogated him by phone.

Defendant must also have been questioned with investigative intent.  This component of custodial interrogation requires the inquiry be "conducted by officers who are aware of the potentially incriminatory nature of the disclosures sought." Rodriguez, 356 F.3d 254 at 259 (quoting Morales, 834 F.2d at 38). The questions asked must have been likely to elicit an incriminating response.  Id.  Agent Peters testified that he did not advise Defendant of his Miranda rights because "99% of the time" enforcement is administrative -- aliens are deported, not criminally prosecuted -- and policy is not to Mirandize until prosecuting illegal entry or reentry.  Agent Peters' testimony is reinforced by the fact that the other individual involved was deported, not prosecuted.  Though Agent Peters may have been primarily concerned with administrative deportation, nonetheless, he had reason to believe Defendant was falsely representing his

status because the alien registration number he provided was unassigned and he knew that false representation alone could give rise to criminal charges.  The information Agent Peters sought in the conversation with Defendant, i.e., his citizenship and immigration status, was likely to elicit an incriminating response.  See United States v. Toribio-Toribio, No. 09-cr-161, 2009 WL 2426015 (N.D.N.Y. Aug. 6, 2009) (suppressing statements made in response to questions about citizenship because defendant was subjected to custodial interrogation without a Miranda warning).  The second component of custodial interrogation is met.

Because Defendant was in custody and questioned with investigative intent, Miranda warnings were required.  The government does not contest that neither Officer Young nor Agent Peters apprised Defendant of his Miranda rights before Agent Peters questioned him over the phone.  The interrogation was in violation of Defendant's Fifth Amendment rights.  Accordingly, the statements Defendant made to Agent Peters on the phone on February 22, 2009 are suppressed.

    C.    <u>Swanton Border Patrol Station</u>

After the phone conversation, Agent Peters drove to Colchester and "administratively arrested" Defendant for being in the United States illegally.  Agent Peters handcuffed Defendant and transported him and the other individual to the Swanton

13

Border Patrol station. In Swanton, Agent Peters took Defendant's fingerprints from which he ascertained that Defendant had criminal and immigration records. At this point, Agent Peters determined Defendant may be criminally prosecuted, so he advised Defendant of his Miranda rights in Spanish. (Government's Ex. 2.) Defendant waived his right to a lawyer and gave a sworn statement indicating he was an illegal alien and had criminal and immigration records. Defendant moves to suppress his fingerprints, criminal and immigration records, and the Swanton statement.

The Fourth Amendment does not bar the fingerprinting of a properly seized person. "Fingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search." Davis v. Mississippi, 394 U.S. 721, 727 (1969). So long as the initial seizure of the person is reasonable, as in a lawful arrest, subsequent fingerprinting is permissible. United States v. Wade, 388 U.S. 218, 223 (1967) (fingerprinting and other identification procedures do not violate the Fourth Amendment if the subject is validly arrested).

Since Defendant was lawfully in custody at the Colchester station because probable cause existed to arrest him, Defendant remained lawfully in custody when Agent Peters removed him to the Swanton station. Probable cause existed notwithstanding Agent Peters' unlawful interrogation of Defendant on the phone because

14

of the unassigned alien number and suspect social security card he provided. Because Defendant's fingerprints were taken while he was in lawful custody, the Fourth Amendment was not violated.

Defendant's criminal and immigration records resulted from the valid fingerprinting of Defendant. Since the records were not obtained through unconstitutional activity, the records are not suppressible. Arias-Gonzalez, 556 F.3d at 1189.

Finally, Defendant moves to suppress statements made at the Swanton station. As discussed above, the government bears the burden of establishing by a preponderance of the evidence that law enforcement officers properly advised an accused of his Fifth Amendment rights and that he made a knowing and voluntary waiver of them. Id. at 444; Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Ramirez, 79 F.3d 298, 304 (2d Cir. 1996).

The Supreme Court has twice addressed the admissibility of Miranda warned statements obtained after an earlier unwarned statement. Oregon v. Elstad, 470 U.S. 298 (1985); Missouri v. Seibert, 542 U.S. 600 (2004). As the government argues, Elstad focused on the voluntariness of the pre- and post-warning statements. (Paper 13 at 11.) Seibert, however, shifted the focus to whether the Miranda warning was effective. The Second Circuit recently held Seibert lays out an exception to Elstad for cases in which a deliberate, two-step strategy was used to obtain

the post-warning confession.  United States v. Carter, 489 F.3d 528, 536 (2d Cir. 2007).

To determine whether a deliberate, two-step strategy was used -- meaning Seibert would apply and not Elstad – the Carter court analyzed factors such as the extent of the pre-warning questioning; the location of and time between the pre- and post-warning statements; whether the officer taking the warned statement was aware of the unwarned one; and whether the post-warning questioning was a continuation of the pre-warning questioning.  Id.

Here, the pre-warning questioning pertained to Defendant's citizenship, and, though it led to an admission that Defendant was illegally in the United States, did not address prior deportations or a criminal record, the facts which led to this criminal prosecution for illegal reentry.[2]  The pre- and post-

---

[2] The Fifth Circuit has held, in immigration cases, a court must examine the "purpose" of the illegality in deciding whether to exclude evidence. Oscar-Torres, 507 F.3d at 231-32.  This analysis requires focusing on the law enforcement officers' motivation:  if an officer was motivated by an investigative purpose, the illegally obtained evidence must be suppressed; but if the officer was motivated by an administrative purpose, the evidence may be admitted despite an illegality.  Id. at 232.
  Agent Peters was unfailing in his testimony that he perceived his dealings with Defendant as administrative until he had reason to believe Defendant could be prosecuted for illegal reentry.  Immediately upon receiving this information, Agent Peters administered a Miranda warning.  The Court finds in the alternative that Agent Peters' failure to warn Defendant prior to his statements made during the phone conversation does not require suppression of the later statements made in Swanton because the illegality occurred while Agent Peters was motivated by and the statements obtained for an administrative purpose.
  This finding may seem to conflict with the Court's prior holding that the phone interrogation met the criteria for investigative intent.  The definition of investigative intent for purposes of a Fifth Amendment violation is focused on the officer's awareness that an incriminating statement may be elicited.  Though Agent Peters was aware his questions could elicit an

16

warning statements overlapped in subject matter but the post-warning statement included the admission that Defendant had criminal and immigration records. The statements were made in different locations, one by phone and the other in person, and a few hours apart. But they were made to the same officer, Agent Peters. On these facts, and in light of the Fifth Circuit's formulation of the application of the exclusionary rule in immigration cases, see note 2, the Court finds a deliberate, two-step strategy was not employed here to obtain a post-warning confession and, therefore, Elstad applies.

The Elstad Court considered the voluntariness of each statement in determining the admissibility of the post-warning statement. 470 U.S. at 314-15. It concluded: "The fact that a suspect chooses to speak after being informed of his rights is [] highly probative. . . [T]he dictates of Miranda and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied . . . by barring use of the unwarned statement." Id. at 318.

Defendant does not dispute that he received complete Miranda rights in Spanish. Defendant does not claim his second statement was involuntary. Instead he argues the statement is inadmissible because of the allegedly unlawful arrest. He also does not

---

incriminating response, he was motivated by an administrative purpose and did not intend or expect his dealings with Defendant to culminate in a criminal prosecution. As soon as he was aware of that possibility, he promptly Mirandized Defendant.

dispute Agent Peters' testimony that he waived his rights in writing. Though Defendant was in custody at the time of the pre-warning statement, he was not under formal arrest. The statements were made in a phone conversation, not in person, and Defendant was in a hallway. Agent Peters' questioning of Defendant was administrative in nature and not meant to be an interrogation of Defendant for later use in a criminal prosecution. Under these circumstances. the statements were voluntary under the Fifth Amendment

Defendant's statements to Agent Peters at the Swanton station should not be suppressed under either Elstad or Seibert or even the standards set by the Fifth Circuit in Oscar-Torres.

IV. Conclusion

For the foregoing reasons, Defendant Adoni-Pena's motion to suppress statements and other information (Paper 12) is GRANTED in part and DENIED in part. Defendant's statement to Agent Peters on the phone is suppressed; the other evidence sought to be suppressed was not obtained in violation of Defendant's Fourth or Fifth Amendment rights and is admissible.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 23rd day of October, 2009.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
Senior United States District Judge